Filed 10/11/24  In re J.A. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re J.A., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>J.A.,<br><br>  Defendant and Appellant. | F086620<br><br>(Super. Ct. No. JVDL-21-000061)<br><br>**OPINION** |

APPEAL from an order of the Superior Court of Stanislaus County.  Jeff Mangar, Judge.

Arthur L. Bowie, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Lewis A. Martinez, and Amanda D. Cary, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

J.A. (appellant) is alleged to have participated in the attempted robbery of a drug dealer when appellant was four months shy of his 18th birthday. When the drug dealer tried to flee by driving away, appellant shot and injured the drug dealer. The juvenile court concluded appellant was not amenable to rehabilitation while under its jurisdiction and granted the prosecution's motion to transfer appellant to a court of criminal jurisdiction pursuant to Welfare and Institutions Code[1] section 707. Appellant contends the court's findings are not supported by substantial evidence and the prosecution did not meet its burden of proving by clear and convincing evidence that he was not a suitable candidate for treatment under the juvenile court system. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. The Alleged Offenses[2]

At approximately 9:00 p.m. on April 17, 2021, Modesto police officers were dispatched to a residence on Celeste Drive to investigate a report of a male who had been shot. Upon arrival, officers observed Noah S. (or "the victim") lying on the grass in front of the residence while bystanders attempted to provide aid. Noah appeared to have suffered a gunshot wound. Officers asked Noah what happened, but he would only say he was shot and was unsure where it occurred.

Keegan M. was in the front yard of the residence where Noah was found. Keegan told police Noah had been his best friend since childhood. Keegan was inside his residence when he received a text message from Noah stating he was in the front yard and had been shot. Keegan found Noah lying in the front yard with a gunshot wound to the chest.

---

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

[2]     The facts of the offenses are taken from the probation officer's report and the evidence presented at the transfer hearing. Whether appellant committed the offenses is not the issue in determining his fitness for transfer from juvenile court, and the criteria used in making that determination are based on the premise that appellant committed the alleged offenses. (*Kevin P. v. Superior Court* (2020) 57 Cal.App.5th 173, 186 (*Kevin P.*).)

Police Officer Tyler Eppler searched Noah's truck, which was parked on the street in front of Keegan's residence. The driver's side window was shattered with an apparent bullet hole in the bottom right corner. There was blood on the driver's side door and seat. The truck contained three plastic bags of marijuana, loose flakes and buds of marijuana, a red grinder with marijuana residue, several used joints in the ashtray, approximately $170 in cash, a digital scale, and a glass water bong. The truck's keys were still in the ignition.

Noah was transported by ambulance to a hospital. His injuries were not considered life-threatening. Noah was initially minimally cooperative during a police interview at the hospital. He indicated he was shot by a slim individual, 5 feet 8 inches tall, covered with clothing or a mask. Noah believed he was shot because somebody wanted his marijuana. When asked if he wanted prosecution, Noah responded, "I don't really give a fuck."

Police Detective Joshua Lawrence interviewed Noah at the hospital on April 21, 2021. Noah was cooperative once Lawrence explained the shooting was the principal aspect of the police investigation. Noah told Lawrence he sells marijuana. Shane Stockdale[3] contacted Noah to purchase an ounce of marijuana. Noah did not know Stockdale and does not like selling to strangers but felt comfortable selling to Stockdale based on his observations of Stockdale's social media.

Stockdale sent Noah a Snapchat[4] message with a location to meet for the sale on Elgin Way in Modesto. When Noah arrived at the agreed-upon location, Stockdale got into Noah's truck but left the door open. Stockdale asked to see the marijuana. Instead of giving Stockdale the entire bag of marijuana, Noah gave Stockdale a "nug" or piece of marijuana to inspect. Noah was looking around for a second bag when he heard metal

---

[3]     Stockdale had reached the age of maturity a few weeks prior to the shooting.

[4]     Snapchat is a multimedia messaging application that allows users to communicate with each other.

rapping on the driver's side window. Noah believed the rapping was likely from a firearm. Noah immediately put the truck into drive and sped away. Stockdale managed to get out of the truck before Noah took off. Noah heard a single gunshot as he attempted to speed away. The bullet passed through Noah's left arm, entered his left rib cage, and exited his chest. Noah drove to Keegan's house because he was unsure of what to do if he went to the hospital. Noah was unarmed during the shooting.

Police searched the location Noah identified as the potential crime scene. A single nine-millimeter spent cartridge, head-stamped "FC," was discovered. Video from a surveillance camera on a nearby residence was also recovered. At approximately 8:53 p.m. on April 17, 2021, the video showed two males walking south along the east sidewalk toward where the spent cartridge was found. One male continued walking south while the other split toward the crime scene location. A motion-activated light came on illuminating their presence. The male on the east side of the street went out of sight while the other male stood near the location of the discovered cartridge. Noah's truck turned onto the street and stopped where the male was standing. About a minute or so later, a second figure ran from the east side of the street toward the driver's side of Noah's truck. A noise consistent with a gun rapping on glass was recorded. The truck's brake lights came on immediately, the truck began to move, and a gunshot was heard. The truck continued out of the area, and the two figures ran north, past the view of the surveillance camera.

Noah consented to the police downloading information from his cell phone. Police identified Stockdale by the Snapchat account used to message Noah to coordinate the sale. Noah also identified Stockdale in a six-pack photo lineup. Noah's family later located a bullet under the passenger side floormat of his truck.

Stockdale was arrested at his residence in Modesto on April 22, 2021. Stockdale's cell phone was seized when he was arrested, and the information on his phone was downloaded pursuant to a search warrant. His phone's location records showed

Stockdale was in the area of the shooting from 8:44 p.m. until 9:08 p.m. that night. About 10 minutes prior to the shooting, a police scanner application was downloaded to Stockdale's phone. Stockdale's phone had a Snapchat conversation between him and an account with vroski03 as the username and appellant's first name as the vanity handle. Police connected the Snapchat account for vroski03 to appellant's cell phone number from an unrelated police report of appellant taking a vehicle without his parents' permission. Appellant's stepfather had provided appellant's phone number to the police as part of that report.

A text conversation between Stockdale and appellant on TextNow[5] was discovered on Stockdale's phone. In the conversation, Stockdale was concerned Noah and Keegan thought Stockdale had been the shooter. Stockdale implored appellant to correct the situation because everyone believed Stockdale was the shooter. The two discussed getting rid of the weapon used in the shooting and the potential need for Stockdale to obtain a firearm for protection. Stockdale expressed concern Keegan would try to get revenge.

The web history on Stockdale's phone showed multiple searches the night of the shooting into the next morning about how to delete a Snapchat account. There were also several searches for "How long is a life sentence?" The history included searches for the shooting and how long fingerprints last.

While a search warrant for appellant's residence was being written, Police Officer Frank Ignacio conducted undercover surveillance on the residence to arrest appellant. Ignacio saw appellant leaving his residence on foot and followed. Ignacio pulled up behind appellant in the undercover vehicle and called out to him. Appellant stopped and was compliant as Ignacio arrested him. Ignacio searched appellant incident to the arrest

---

[5]     TextNow is an application that may be used to call, text, and send photos with a number chosen by the user. Law enforcement has difficulty finding the user associated with the number on TextNow because numbers in the application are randomly chosen and rotated.

and discovered a loaded nine-millimeter caliber pistol on his person. Appellant was also carrying two driver's licenses belonging to other people, suspected marijuana, cigars, and lighters. The police seized from appellant the pistol, a wallet with hundreds of dollars in cash, and a phone. A round removed from the pistol was a hollow-point round, head-stamped with "FC." Analysis of the spent cartridge found on Elgin Way showed it was not fired from the pistol recovered from appellant at the time of his arrest.

The search warrant for appellant's residence included appellant's cell phone. Search of appellant's cell phone showed the same number associated with the vroski03 Snapchat account and the TextNow account phone number. Location records on appellant's phone indicated appellant was in the area where the shooting occurred during the 8:00 o'clock hour that night. The web history on appellant's phone showed undated searches for Modesto shootings.

Appellant's phone had a TextNow conversation with an unknown phone number on April 19, 2021, in which the shooting was discussed. The unknown party advised appellant to sell, trade, or get rid of the firearm. Appellant confirmed he would and pondered how Noah had not died from the shooting. Specifically, appellant messaged, "I hit em in the chest. IDK how he ain die."[6]

Prior to his arrest, appellant text messaged his girlfriend, Maddie, stating he was responsible for the shooting and the encounter's purpose was to rob Noah of his marijuana. Appellant sent Maddie a photo of Keegan and asked if she knew him. Appellant instructed Maddie to ask around to see if anyone else could identify Keegan. Maddie messaged appellant that she could explain who the shooter is to law enforcement. Appellant replied, "STFU"[7] to Maddie, and on a later date, appellant sent her a message with a photo of pistol parts.

---

[6]     "IDK" stands for "I don't know."

[7]     "STFU" stands for "shut the fuck up."

A package with appellant's name that looked like gun parts had been inside of it was found during the search of appellant's residence. Police spoke with appellant's mother about appellant's location the night of the shooting. Appellant's mother told police that appellant was at home and watching movies with the family. Text messages on appellant's cell phone showed his mother messaged appellant that night at 10:18 p.m., stating they were going to bed and it was time to come home.

### B. Procedural History

On April 27, 2021, the Stanislaus County District Attorney filed a juvenile wardship petition under section 602, subdivision (a), alleging appellant committed willful, deliberate, and premeditated attempted murder (Pen. Code, §§ 187, subd. (a), 664; count I), attempted first degree robbery (Pen. Code, §§ 211, 664; count II), possession of a concealable weapon by a minor (Pen. Code, § 29610; count III), and misdemeanor possession of live ammunition by a minor (Pen. Code, § 29650; count IV). The petition further alleged appellant personally and intentionally discharged a firearm causing great bodily injury (Pen. Code, § 12022.53, subd. (d)) to Noah as to counts I and II. On the same date the petition was filed, the prosecution moved to transfer appellant to an adult court of criminal jurisdiction under section 707. Appellant filed an opposition to the transfer motion.

### C. The Transfer Proceedings

The probation officer filed a transfer report (§ 707, subd. (a)(1)) with the juvenile court on June 9, 2021. A combined prima facie/transfer hearing[8] was conducted over

---

[8]     In response to a transfer motion, the minor may challenge the sufficiency of the evidence establishing they committed the alleged offenses. (*Kevin P., supra*, 57 Cal.App.5th at p. 186, fn. 8.) If the minor does so, the prosecution must make a prima facie showing the minor committed the offenses. (*Ibid.*; *Edsel P. v. Superior Court* (1985) 165 Cal.App.3d 763, 784; Cal. Rules of Court, rule 5.766(c).) "The juvenile court must find the prosecution has made the required prima facie showing, which is 'generally equivalent to "reasonable and probable cause," ' before it rules on whether the minor is fit for juvenile treatment." (*Kevin P.*, at p. 186, fn. 8.) A so-called "*Edsel P.* hearing" may be held jointly with the transfer hearing. (*Ibid.*)

multiple days, commencing on February 17, 2023, with the court's ruling issued on July 21, 2023.

### 1. The People's Evidence

Deputy Probation Officer Manny Dhillon prepared the transfer report and testified on the prosecution's behalf. To prepare the report, Dhillon reviewed the police reports, appellant's school records, and incident reports related to appellant's time in juvenile hall; Dhillon also interviewed appellant and his mother. Dhillon's report and testimony are summarized below.

Appellant was born in Redwood City, California. His parents never married and separated before he was born. His father was in and out of the house and struck appellant, mostly with a belt, approximately five times between the ages of seven and 12. Appellant and his mother denied that appellant was a victim of sexual abuse or had physical health issues. He was diagnosed with attention deficit hyperactivity disorder (ADHD) at eight years old. Appellant was prescribed medication for his ADHD, which he had been taking while in custody.

Appellant's family had to live with extended family when he was young due to economic difficulties, but money had not been an issue since the family moved when appellant was approximately 11 years old. At the time of his arrest, appellant was living with his mother, stepfather and two younger half-siblings in Modesto. Appellant did not get along with his stepfather when he was younger because appellant struggled to accept him as his real dad but had since developed a good relationship with him. Appellant had a good relationship with his mother and half-siblings. He did not have a relationship with his father.

Appellant's friend was shot and killed when appellant was about 16 years old. Appellant was unsure if the shooting was gang related. His friends may have been involved in gangs, but appellant was not. Appellant occasionally thought about his friend's death and had trouble sleeping at night.

8.

Appellant started using marijuana and alcohol when he was 16 years old. Appellant reported using marijuana two to three times per week at the time of his arrest, but his mother said he was using it daily. Appellant reported using alcohol once per month, but his mother believed he drank weekly. Appellant also abused cough medicine and prescription medications. Appellant did not believe he was addicted to marijuana or alcohol, and previously refused to participate in rehabilitation because he did not feel he had a problem. Appellant has no history of previous delinquencies.

Due to his ADHD, appellant was a special education student at school since he was young. He was suspended multiple times in high school. In 2018, appellant was disciplined by the school for dumping a baggie of marijuana and a lighter behind a tree when called over by security and given a warning another time for possessing unspecified contraband on campus. He had two discipline reports for being under the influence of drugs, a report for vaping in the bathroom, and a report for purchasing a vape pen from another student. Appellant's grades were average to below average, and he reported being behind on credits in high school.

Dhillon did not question appellant about the offenses at his attorney's request. Appellant's mother told Dhillon that appellant had expressed remorse for not listening to her and the poor choices he made, particularly in trusting others. When asked if appellant ever expressed remorse for the victim, appellant's mother responded that appellant did not know Noah and had no connection with him, unlike Stockdale.

In the transfer report, Dhillon considered the five statutory criteria[9] for transfer and concluded two criteria weighed in favor of transfer: the degree of criminal

---

[9]    As discussed *infra*, the juvenile court must consider the following criteria in determining a transfer motion: (1) the "degree of criminal sophistication exhibited by the minor" (§ 707, subd. (a)(3)(A)(i)); (2) "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction" (§ 707, subd. (a)(3)(B)(i)); (3) the "minor's previous delinquent history" (§ 707, subd. (a)(3)(C)(i)); (4) "[s]uccess of previous attempts by the juvenile court to rehabilitate the minor" (§ 707, subd. (a)(3)(D)(i)); and (5) the "circumstances and gravity of the offense alleged in the petition to have been committed by the minor" (§ 707, subd. (a)(3)(E)(i)).

sophistication exhibited by appellant and the circumstances and gravity of the offense. With respect to the other three criteria, Dhillon opined appellant can be rehabilitated prior to expiration of the juvenile court's jurisdiction, he had no previous delinquent history, and there had been no previous attempts to rehabilitate appellant. Dhillon believed appellant's lack of a previous delinquent history and partial cooperation in his own rehabilitation showed he can be rehabilitated prior to expiration of the court's jurisdiction. The report did not include an overall recommendation on whether appellant should be transferred to criminal court.[10]

At the transfer hearing on February 23, 2023, Dhillon testified he had changed his mind about the second criterion regarding whether appellant can be rehabilitated before the juvenile court's jurisdiction expired. When he wrote the report, Dhillon believed appellant's ability to grow and mature was limited by his substance abuse and mental health issues. Dhillon noted the discrepancy between appellant's and his mother's reports about the extent of his substance abuse, as well as appellant's prior refusal to participate in rehabilitation or counseling. These issues together with appellant's behavior in juvenile hall made Dhillon question if appellant can be rehabilitated while within the court's jurisdiction. Regarding his behavior in juvenile hall, appellant had two incident reports before the transfer report was filed in June 2021 and 14 additional incident reports between then and the first transfer hearing in February 2023. The most recent report was about 10 days prior, from February 13, 2023. Appellant was on two psychotropic medications and was caught "cheeking" his medication, meaning he pretended to consume it but instead kept the medication in his mouth and attempted to hide it. Because of this incident, juvenile hall began providing medication to appellant in crushed form. An incident report from February 2022 related to appellant not taking his

_____

[10] According to Dhillon, the Stanislaus County Probation Department provides an opinion on each criterion for transfer but refrains from giving an overall recommendation on whether the minor should be transferred unless directed to do so by the juvenile court.

10.

medication and noted that seven pills were found during a search of his room. These incidents indicated to Dhillon that appellant was reluctant to follow the medication protocol to address his mental health issues. Seven of the incident reports involved fights, four of which appellant started and five of which he refused to obey the cover command, necessitating the use of pepper spray or force to stop the altercations. There was also a report appellant had been in possession of a vape pen containing concentrated THC. Dhillon believed this showed appellant was still engaging in substance abuse while in custody. Dhillon acknowledged appellant had improved his GPA while in juvenile hall and his teacher reported no behavioral issues. However, the number and nature of the offenses in the incident reports made Dhillon feel that appellant was not open to change and juvenile services would not assist him.

## 2. *Defense Evidence*

Defense counsel retained a forensic psychologist, Carolyn Murphy, Ph.D., to conduct a psychological evaluation of appellant. In conducting her evaluation, Dr. Murphy reviewed multiple records and reports and interviewed appellant and his mother. Dr. Murphy prepared two reports regarding appellant and testified on his behalf as an expert forensic and clinical psychologist. Dr. Murphy's observations and opinions from her reports and testimony are summarized below.

Appellant had a difficult time adjusting to the separation of his parents and not having his father regularly in his life. Appellant resented his stepfather and did not see him as a father. As appellant became older and when his half-siblings came along, he understood the nature of his mother's relationship with his stepfather. Appellant had been excited when his father expressed a desire to see him when appellant was eight years old, but his father then disappeared again and stopped contacting appellant. This was more painful to appellant than if his father had never been a part of his life in the first place. When his father came back again when appellant was 15 or 16 years old, appellant told his mother he did not want to see his father.

Appellant recalled exposure to domestic violence when he was younger. He would hear arguments and objects being thrown and broken, and the police were called, although appellant was uncertain if anyone was arrested. Appellant's father had difficulty letting his mother go and once tried to break into the house to see her. Appellant also recalled his father coming over and throwing rocks at their door.

Appellant's father was known to use alcohol and cannabis, and his stepfather abused alcohol as well. Appellant believed his mother and sister suffered from mental health issues.

In addition to appellant's friend that was shot in late 2019, appellant told Dr. Murphy another friend died from an overdose in early 2020. Appellant had been close to his friends in the Bay Area, and the family's move to Modesto left appellant feeling lonely, sad, and a little depressed. He ended up falling in with negative peers after the move. Appellant began carrying a gun at the age of 16 for protection after moving to Modesto, secondary to being shot at because he was likely mistaken for a gang member for wearing black and red shoes.

Appellant disclosed to Dr. Murphy he was sexually abused at ages seven and 13 but was uncomfortable providing details of the abuse because he was embarrassed. Dr. Murphy was unsurprised that appellant did not disclose his sexual abuse to a male probation officer.

Dr. Murphy diagnosed appellant with persistent depressive disorder, cannabis use disorder (severe), other specified substance use disorder (cold tablets), and ADHD (by history). Appellant's cannabis use disorder was considered severe because he used it regularly, persistently, and sometimes in conjunction with cold medication. Dr. Murphy identified seven adverse childhood experiences appellant had been exposed to: physical abuse; sexual abuse; domestic violence; separation and divorce; criminality; substance use; and mental health.

Appellant told Dr. Murphy that on the day of the shooting, he had been using

12.

marijuana and was under the influence of oxycontin. Dr. Murphy found that while the attempted robbery was planned, there was no evidence the shooting was planned and appeared to be something sudden and impulsive. She believed the shooting was the product of extremely poor decisionmaking on appellant's part. Dr. Murphy concluded appellant was not criminogenically sophisticated and noted appellant's lack of a prior delinquency history, mental and emotional difficulties, ADHD, and adverse childhood experiences. She believed appellant knows the difference between right and wrong.

Dr. Murphy did not consider appellant an incorrigible youth and opined he is amenable to treatment. She acknowledged appellant had some behavioral issues while in juvenile hall, but nothing "really horrific," and had been participating in programs and services. Dr. Murphy opined that appellant's behavioral issues were a manifestation of what he had been exposed to and his depression and addiction issues were treatable. Dr. Murphy believed there was still time to treat appellant's issues and appellant can be rehabilitated by the end of the juvenile court's jurisdiction. Appellant would need mental health treatment, substance abuse treatment, vocational services, to complete his education, and to develop an identity separate from this angry person associating with negative peers and developing an aimless lifestyle.

On cross-examination, Dr. Murphy said she had never written a report recommending a minor be transferred to adult court, but she had found minors were not amenable to rehabilitation about 10 percent of the time. Dr. Murphy testified she could not "ethically … ever render the opinion that [a minor] should go to adult court" but acknowledged she could "see a situation" where she could argue a minor should not be retained in juvenile court. She did not speak to appellant about whether he has remorse for the shooting and testified remorse has "absolutely no statistical relevance to recidivism." She stated the research does not show remorse is important to whether someone is amenable to receiving treatment. Dr. Murphy could not specifically identify

13.

which adverse childhood experience caused appellant to commit the offenses and opined his conduct resulted from a totality of factors.

Dr. Murphy confirmed there was no corroboration for the alleged sexual abuse and that appellant could have been making it up, but she said she believed him. She opined it is difficult for men to discuss abuse they have suffered, and she did not press appellant regarding the allegations because she worried about the damage doing so could cause.

Stanislaus County Probation Superintendent Tracie Martin testified about the rehabilitative services available to youths in the Secure Track program. After the incarcerated youth receives their high school diploma, they can advance their education through online general education or vocational courses with a junior college. Various types of vocational training are available. Youths are also taught cognitive behavioral interventions and aggression replacement therapy. The county has options for step-down programs, including permitting a youth to be out in the community with a GPS monitor, transitional age housing, or a fire camp. Access to a therapist or mental health provider is given to the youth if needed. A youth is put under a probation officer's supervision when released from the Secure Track unit. Before a youth is released, there are reintegration meetings to discuss re-entry plans and provide information on services so the youth can continue with their goals through community-based organizations.

### 3. Reopening the Record

On March 10, 2023, after the juvenile court found a prima facie showing had been made on all counts and enhancements,[11] the parties began their closing arguments on the transfer motion, but defense counsel was unable to complete her argument due to time constraints. The hearing was continued to March 24, 2023, and then continued again to March 30, 2023.

---

[11] Appellant had previously stipulated a prima facie showing had been made on counts II, III, and IV.

14.

Before the hearing on March 30, 2023, the prosecution requested the record be reopened to present evidence about an incident that occurred at juvenile hall on March 24, 2023, after the previous hearing was continued. Appellant filed an opposition to the prosecution's motion to reopen the record. After hearing both parties' arguments, the court allowed the prosecution to reopen the evidentiary record.

Dhillon was recalled to testify about the March 24, 2023 incident report. On that date, appellant was observed acting suspiciously and attempting to hide something after he was given his medication. When told to show what he had, appellant refused to show both his hands and tried to hide something in his sweatshirt. The item fell out onto the floor and was observed to be a pill. Appellant stomped on the pill, crushing it.

On cross-examination, Dhillon acknowledged appellant had an incident on February 25, 2023, where he alerted the staff that his medication was making him dizzy. In response, the staff changed the timing of the medication but not the dosage. Dhillon was unsure which medication appellant destroyed and which medication was causing dizziness.

The prosecution rested again after Dhillon's testimony was complete. Appellant submitted additional documentary evidence of his progress in juvenile hall, closing arguments were completed, and the matter was submitted in June 2023.

### D. The Juvenile Court's Ruling

On July 21, 2023, the court issued an 11-page ruling granting the prosecution's motion to transfer appellant to criminal court. In reaching its determination, the court considered witness testimony and several records, including the probation department's transfer report, the parties' briefing, and appellant's supporting documentation. The court concluded the prosecution had met its burden by clear and convincing evidence that appellant is not amenable to rehabilitation while under its jurisdiction.

Appellant timely appealed the juvenile court's order.[12]

## DISCUSSION

### I. General Legal Principles and Standard of Review

"Section 707 sets forth the procedures for transferring a minor from juvenile court to criminal court. It provides that whenever a minor aged 16 years or older is alleged to have committed a felony, the prosecutor may move 'to transfer the minor from juvenile court to a court of criminal jurisdiction.' (§ 707, subd. (a)(1).) The prosecution bears the burden of proving that the minor should be transferred. (Cal. Rules of Court, rule 5.770(a).)" (*In re Miguel R.* (2024) 100 Cal.App.5th 152, 164 (*Miguel R.*).)

"Upon receiving a transfer motion, the juvenile court is required to 'order the probation officer to submit a report on the behavioral patterns and social history of the minor.' (§ 707, subd. (a)(1).) In addition to the transfer report, the court may consider 'any other relevant evidence that the [prosecutor] or the minor may wish to submit.' (§ 707, subd. (a)(3).)" (*Kevin P., supra*, 57 Cal.App.5th at p. 186.)

Section 707, subdivision (a)(3) provides five criteria for determining whether a minor should be transferred to criminal court: (1) the "degree of criminal sophistication exhibited by the minor" (§ 707, subd. (a)(3)(A)(i)); (2) "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction" (§ 707, subd. (a)(3)(B)(i)); (3) the "minor's previous delinquent history" (§ 707, subd. (a)(3)(C)(i)); (4) "[s]uccess of previous attempts by the juvenile court to rehabilitate the minor" (§ 707, subd. (a)(3)(D)(i)); and (5) the "circumstances and gravity of the offense alleged in the petition to have been committed by the minor" (§ 707, subd. (a)(3)(E)(i)). The weight to be given to each of the five criteria is within the court's discretion. (*C.S. v. Superior Court* (2018) 29 Cal.App.5th 1009, 1034–1035.)

---

[12] An order transferring a minor from juvenile court to criminal court is subject to immediate appellate review. (§ 801, subd. (a); Cal. Rules of Court, rule 5.770(g).)

Section 707 "sets forth a nonexhaustive list of relevant factors for the court to consider with respect to each of the five criteria. (§ 707, subd. (a)(3)(A)(ii), (B)(ii), (C)(ii), (D)(ii), (E)(ii).)" (*Miguel R., supra*, 100 Cal.App.5th at p. 164.)

We review a juvenile court's order transferring a minor to criminal court for abuse of discretion. (*Kevin P., supra*, 57 Cal.App.5th at p. 187.) "The court's factual findings are reviewed for substantial evidence, and its legal conclusions are reviewed de novo. [Citation.] A decision based on insufficient evidence or the court's ' "erroneous understanding of applicable law" ' is subject to reversal." (*Ibid.*)

In reviewing for substantial evidence, we draw all reasonable inferences in support of the court's findings. (*Miguel R., supra*, 100 Cal.App.5th at p. 165.) "Substantial evidence is evidence that is 'of ponderable legal significance,' 'reasonable in nature, credible, and of solid value,' and ' "substantial" proof of the essentials which the law requires in a particular case.' " (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1006.) On appeal, we do not reweigh the evidence and "must accept the fact finder's resolution of conflicting evidence." (*Id.* at p. 1008.)

## II.    Amendments to Section 707

Until recently, the prosecution was required to establish by a preponderance of the evidence that a minor should be transferred to criminal court. (*In re S.S.* (2023) 89 Cal.App.5th 1277, 1284.) Effective January 1, 2023, Assembly Bill No. 2361 (2021–2022 Reg. Sess.) (Assembly Bill 2361) amended section 707, subdivision (a)(3) to add the following language: "In order to find that the minor should be transferred to a court of criminal jurisdiction, the court shall find by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (Stats. 2022, ch. 330, § 1.) Section 707, subdivision (a)(3) was further amended to require the court's order transferring jurisdiction to "include the reasons supporting the court's finding that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (*Ibid.*)

17.

Assembly Bill 2361 made three important changes to section 707. First, by increasing the prosecution's burden of proof on a transfer motion from a preponderance of the evidence to clear and convincing evidence. Second, whether the minor is amenable to rehabilitation while under the juvenile court's jurisdiction became the "ultimate question for the court to decide." (*In re E.P.* (2023) 89 Cal.App.5th 409, 416.) Third, the "amended statute requires the court to not only recite the basis for its decision, but also the reasons supporting the court's finding that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (*Ibid.*)

Effective January 1, 2024, Senate Bill No. 545 (2023–2024 Reg. Sess.) (Senate Bill 545) further "amended section 707 to require that with respect to each of [the] five criteria the juvenile court 'shall give weight to any relevant factor,' including the specific factors listed as relevant to each criterion. (§ 707, subd. (a)(3)(A)(ii), (B)(ii), (C)(ii), (D)(ii), (E)(ii).) The previous version of the statute made consideration of those factors discretionary, not mandatory. (Former § 707, subd. (a)(3)(A)(ii), (B)(ii), (C)(ii), (D)(ii), (E)(ii).)" (*Miguel R., supra*, 100 Cal.App.5th at pp. 164–165.)

Senate Bill 545 also made changes to the factors to be considered when determining the minor's degree of criminal sophistication. (*Miguel R., supra*, 100 Cal.App.5th at p. 165.) Specifically, when the juvenile court issued its ruling here, former section 707, subdivision (a)(3)(A)(ii) instructed the court to consider "the minor's age, maturity, intellectual capacity, and physical, mental, and emotional health at the time of the alleged offense, the minor's impetuosity or failure to appreciate risks and consequences of criminal behavior, the effect of familial, adult, or peer pressure on the minor's actions, and the effect of the minor's family and community environment and childhood trauma on the minor's criminal sophistication." Senate Bill 545 added as factors to this criterion whether the minor had any involvement in the child welfare or foster care system and the minor's status as "a victim of human trafficking, sexual abuse,

18.

or sexual battery." (Stats. 2023, ch. 716, § 1; see *Miguel R.*, at p. 165.)[13]

## III. Analysis

Appellant contends the court's findings are not supported by substantial evidence and the prosecution did not meet its burden to prove by clear and convincing evidence that appellant is not a suitable candidate for treatment under the juvenile court system. Appellant further contends the court abused its discretion because there was insufficient evidence supporting his transfer to criminal court. Appellant argues the appropriate remedy is to vacate the transfer order and enter a new order denying the section 707 petition.

The court found three criteria weighed in favor of appellant's transfer: (1) the degree of criminal sophistication exhibited by appellant; (2) whether appellant can be rehabilitated before expiration of the court's jurisdiction; and (3) the circumstances and gravity of the offense alleged to have been committed by appellant. The court found appellant's lack of a previous delinquency history or previous attempts at rehabilitation weighed against transfer. We consider the court's findings and analysis on each of the five criteria and its conclusion on the ultimate question of whether appellant is amenable to rehabilitation while under the juvenile court's jurisdiction.

### A. Degree of Criminal Sophistication

For the criminal sophistication criterion (§ 707, subd. (a)(3)(A)(i)), the juvenile

---

[13] Although the parties' briefing in this matter was filed months after Senate Bill 545 became effective, neither party discussed the effect, if any, of Senate Bill 545 on this appeal. While we assume any ameliorative effects of Senate Bill 545 apply to appellant's case because there is no final judgment yet (see *Miguel R., supra*, 100 Cal.App.5th at pp. 169–170), we discern no basis in the record to remand for the juvenile court to apply the amended version of section 707 because the challenged ruling was consistent with Senate Bill 545. Specifically, the court expressly stated it "must evaluate" the statutory factors for each criterion and treated the factors as mandatory rather than discretionary. The court also considered in its ruling the evidence that appellant was a victim of sexual abuse, the only evidence of the factors added to the first criterion by Senate Bill 545. (See, e.g., *Miguel R.*, at pp. 169–170 [no reasonable probability of a more favorable result for the minor under Senate Bill 545 where the minor had an incentive to present evidence of the new factors, but none was in the record].)

19.

court "consider[s] the whole picture, that is, all the evidence that might bear on the minor's criminal sophistication, including any criminal sophistication manifested in the present crime." (*People v. Superior Court* (*Jones*) (1998) 18 Cal.4th 667, 683–684 (*Jones*).)

The court found this criterion weighed strongly in favor of transferring appellant to criminal court based primarily on his age at the time of the offense, the way the crime was committed, and the specific role appellant played in committing the offense. While unsuccessful, appellant and his coconspirator planned the attempted robbery and obtained a firearm for its execution. The coconspirator communicated with Noah to arrange the drug sale[14] and downloaded a police scanner application just before the scheduled meeting. Appellant and his coconspirator arrived at the scene together but split up and waited across the street from each other. Appellant was the only one armed. The coconspirator approached Noah's truck from the vehicle's passenger side while appellant approached from the driver's side. Appellant cocked the firearm, rapped on Noah's window, and then shot Noah as he tried to flee. The court rightly considered appellant a "major participant" as the one who personally fired at the victim during the attempted robbery. The court was especially concerned that appellant shot an unarmed male at close range "in the chest"[15] when he was not an imminent threat to appellant. Appellant later disposed of the incriminating firearm and obtained a replacement firearm and ammunition in case of retaliation. After the shooting, appellant and Stockdale

---

**14** Appellant argues the court's observation that "[appellant] made arrangements to meet the victim at night" is misplaced because the evidence shows Stockdale, not appellant, arranged the sale with Noah. This ambiguous reference to only appellant does not demonstrate the court misunderstood the material facts, and the court correctly observed appellant and Stockdale jointly "planned the sequence of steps of the robbery."

**15** Appellant claims there "was no evidence" he shot Noah in the chest and takes issue with the court's description of where Noah was shot. The bullet entered Noah's arm, went into his rib cage, and exited from his chest. While perhaps an inartful description because appellant did not shoot Noah directly in the chest, the bullet did go through his chest. Appellant even said in a message to an unidentified person: "I hit em in the chest."

communicated through a stealth messaging application where appellant expressed surprise that Noah did not die.

Substantial evidence supports the court's finding that appellant showed a degree of criminal sophistication, including the detailed planning of the attempted robbery with a coconspirator, the fact that appellant obtained a firearm, and the disposal of the firearm linking him to the shooting.[16] (See *Jones, supra*, 18 Cal.4th at p. 684 [minors' ineptitude at committing offenses did not preclude finding of criminal sophistication as evidenced by the minors' detailed planning, obtaining a firearm, and disposal of evidence].) As the court found, there was no evidence appellant's family or any adults pressured him to commit the offense. Appellant was approximately four months shy of maturity, and he and his coconspirator were only five months apart in age. The court logically concluded Stockdale's reported surprise that appellant took the initiative to shoot the victim indicated appellant was not pressured by anyone to do so. The shooting was not part of the plan. While Dr. Murphy deemed the shooting an impulsive act, the court found appellant's surprise that Noah survived suggests appellant underestimated Noah's response and took aim at Noah during the ambush. Appellant's surprise at Noah's survival also shows he understood the potentially lethal consequences of his criminal behavior. The court acknowledged appellant's accounts of sexual abuse to Dr. Murphy but noted appellant gave no details and there was no corroboration for these allegations. Accordingly, no correlations between this specific adverse childhood experience and appellant's "delinquent behavior could be acceptably opined."[17]

---

[16] While not discussed by the court, the selection of a victim based on the unlikeliness of the robbery being reported also shows criminal sophistication. (See *Jones, supra*, 18 Cal.4th at p. 684; *In re Harper* (2022) 76 Cal.App.5th 450, 462, fn. 6 [a "defendant might steal from a drug dealer, an undocumented immigrant, or even a family member and reasonably assume the victim will be reluctant to report the crime to the police"].)

[17] We acknowledge the court's discussion of the sexual abuse is in the second criterion's section, but the discussion reflects the court considered this childhood trauma as a factor in assessing appellant's criminal behavior.

Appellant contends the court "downplayed" Dr. Murphy's observations about the role appellant's mental health and substance abuse played in his decisionmaking processes in committing the offense. Appellant disputes the court's conclusion that there was no indication appellant's community environment negatively affected his criminal sophistication because Dr. Murphy gave contrary evidence about his two friends who died,[18] falling in with negative peers after moving, and doing poorly in school.

Appellant essentially disputes how the court weighed conflicting evidence regarding his degree of criminal sophistication. The court resolves conflicts in the evidence and determines the facts. We may not usurp the fact finder's role by reweighing the evidence on appeal. The court considered Dr. Murphy's observations but was not obligated to adopt her opinion. (See *In re Alejandro G.* (2012) 205 Cal.App.4th 472, 480 [the fact that the court's finding conflicted with two experts' opinions did not show a lack of substantial evidence because the court is not obligated to adopt the experts' opinions].) The court explained that while Dr. Murphy's testimony was "helpful," the court disagreed with some of her conclusions and considered the value of her conclusions limited by what she did and did not consider. The court noted Dr. Murphy testified she could not ever ethically say a minor could be transferred to adult court and her inability to specifically correlate any of appellant's adverse childhood experiences or traumatic events to why he committed the offenses. While the court acknowledged Dr. Murphy stated appellant experienced childhood trauma, including physical abuse by his father, the court concluded appellant's childhood trauma did "not lessen the degree of criminal sophistication."

### B. Rehabilitation Prior to Expiration of Juvenile Court's Jurisdiction

Next, the juvenile court must consider "[w]hether the minor can be rehabilitated

---

[18] Appellant inaccurately states that two of his "childhood friends had been recently killed." Dr. Murphy reported one of appellant's friends was killed and the other died from an overdose.

22.

prior to the expiration of the juvenile court's jurisdiction." (§ 707, subd. (a)(3)(B)(i).) The court considers "the minor's potential to grow and mature" in evaluating this criterion. (§ 707, subd. (a)(3)(B)(ii).) The focus "is whether there is enough time to rehabilitate the minor while the minor is still eligible to remain under juvenile court jurisdiction." (*Miguel R., supra*, 100 Cal.App.5th at p. 166.)

The court determined appellant would be under its jurisdiction for approximately five years based on the charged offenses and appellant's age of nearly 20 at the time of the court's ruling.

The court recounted appellant's history of substance abuse and inconsistent use of medication for his ADHD. Appellant briefly participated in counseling for his substance abuse but subsequently refused to participate because he did not feel he had a problem. When Dhillon asked appellant's mother if he had expressed remorse for the victim, appellant's mother said appellant stated he did not know Noah and there was no connection between them.[19] Appellant had a good relationship with his mother, stepfather, and half-siblings, and money had not been an issue for the family since appellant was 11 years old.

The court found appellant's choices before and after the offenses were proof of his ability to grow and mature. Appellant started carrying a gun when he was 16 years old. When he was an adult and near the conclusion of the transfer hearing, appellant picked up another incident report for not participating in the prescription medication regimen just as he had declined to participate in counseling when younger. Appellant acted further to conceal his negative conduct in juvenile hall by trying to destroy the evidence by crushing the pill. He did not engage in drug counseling when he was younger because he felt he did not have a problem and refused to participate. After considering all the

---

[19]     While appellant argues it is an "unfair mischaracterization" to say he personally articulated no remorse for the victim, the court accurately ascribed this statement to appellant's mother, not appellant.

23.

evidence, the court concluded appellant was unlikely to be rehabilitated by the lapse of its jurisdiction. The court highlighted as problematic the March 24, 2023 incident report.

Appellant does not dispute the court can consider the March 24, 2023 incident, but argues the court failed to consider certain facts leading up to the incident, including: (1) appellant was an adult at the time and had the right to refuse medication; (2) appellant had previously reported the medication made him dizzy; and (3) the juvenile hall had previously changed the way he was given his medication. Appellant's contentions are unpersuasive when these facts are considered in context. First, while appellant was an adult at the time and had the right to refuse medication (see *In re Qawi* (2004) 32 Cal.4th 1, 14), his artificial participation in the medication regimen and attempt to destroy evidence of his noncompliance are not indicative of an amenability to treatment. Appellant had a prior incident report related to his medication approximately a year before when seven pills were found in his room, which reflects a persistent reluctance to follow the medication protocol to address his mental health issues. Second, the record is unclear whether the pill appellant destroyed was the one causing him dizziness, and it is thus unclear if appellant concealed and destroyed this medication to avoid that side effect. Third, the fact that juvenile hall had previously changed the method appellant was given his medications because he had a history of noncompliance before the March 24, 2023 incident is further evidence of his refusal to participate in the medication regimen. Again, this does not indicate an amenability to treatment.

Appellant argues Dr. Murphy's testimony that she could not ever ethically recommend a minor be transferred to criminal court was taken out of its proper context and led the court to disregard her opinions as biased. The court noted this part of Dr. Murphy's testimony, but nothing in the ruling indicates the court deemed Dr. Murphy biased, disregarded her opinions, or did not consider the testimony in context. Because the ultimate question is whether appellant is amenable to treatment while within the court's jurisdiction, expert opinion on whether appellant can be treated is entitled to great

24.

weight in making that determination. (*Jimmy H. v. Superior Court* (1970) 3 Cal.3d 709, 714–715.) But the "decision rests in the sound discretion of the juvenile court." (*Id.* at p. 715.) It was for the court to assess the value of Dr. Murphy's opinions, and the court found that value limited based on what she did and did not consider. The ruling reflects a proper weighing of Dr. Murphy's opinions, not disregard of those opinions due to purported bias.

Appellant also argues the court failed to appreciate the potential length of time for rehabilitation because he could be retained if discharging him would be physically dangerous to the public. (See §§ 1769, subd. (a), 1800, subd. (a).) The court expressly acknowledged section 707 "does not require that rehabilitation be completed before jurisdiction ends," but further recognized "the possibility of completion of the rehabilitation process is a factor" to be considered. The record consequently shows the court understood appellant's period of rehabilitation could extend beyond his 25th birthday.

Appellant contends this case is "factually similar" to *In re S.S.* and this court should reverse the transfer order and remand for a new hearing as the court did in *In re S.S.* In *In re S.S.*, the 17-year-old minor allegedly committed several offenses, including murder, and was ordered transferred to criminal court. (*In re S.S., supra*, 89 Cal.App.5th at pp. 1281–1282, 1284.) The minor's transfer hearing took place before Senate Bill 2361 became effective, but his appeal was after its effective date. (*In re S.S.*, at p. 1284.) On appeal, both parties agreed Senate Bill 2361 applies retroactively and the transfer order must be reversed and remanded for a new transfer hearing. (*In re S.S.*, at pp. 1281, 1288.) The court inferred that the "parties, by urging remand for a new transfer hearing, implicitly agree a more favorable result for minor is reasonably probable." (*Id.* at p. 1289.) The court agreed after consideration of the juvenile court's analysis of each of the five criteria for transfer "through the lens of" the amended statute. (*Ibid.*) For the second criterion of whether the minor can be rehabilitated prior to expiration of the

juvenile court's jurisdiction, the court observed, "[P]roper analysis of this criterion generally requires 'expert testimony concerning the programs available, the duration of any of the programs, or whether attendance would rehabilitate [the minor] before termination of the juvenile court's jurisdiction.' " (*Id.* at p. 1291.) Based partially on the prosecution's failure to present any evidence on the minor's rehabilitative needs or the ability to meet those needs while within the juvenile court's jurisdiction, the court held there was "a reasonable probability the juvenile court would not order [the] minor's transfer under the new version of section 707." (*Ibid.*)

Appellant claims that, like in *In re S.S.*, there is a reasonable probability the juvenile court would not order his transfer on remand because the prosecution failed to put forth any expert evidence about whether he could be rehabilitated within the court's jurisdiction. *In re S.S.* is distinguishable in several important respects. In appellant's case, there is no issue about the retroactive application of Senate Bill 2361 because the amended statute was effective at the time of his transfer hearing and the resulting order. The court specifically cited Senate Bill 2361 in its written ruling and during the hearing announcing the ruling. The record also reflects the court complied with Senate Bill 2361. As acknowledged by appellant, the court expressly identified the standard of proof as clear and convincing evidence. The court identified the ultimate question to be addressed under amended section 707 in its conclusion the prosecution "established by clear and convincing evidence as to each criterion, as well as to the transfer determination, that [appellant] is not amenable to rehabilitation while under the jurisdiction of the Juvenile Court." The 11-page ruling explained the court's reasons for this conclusion and its findings. In this case, unlike in *In re S.S.* and though not proffered by the prosecution, there was evidence about the rehabilitative programs available to appellant in the form of Martin's testimony. We therefore reject appellant's assertion that *In re S.S.* mandates reversal of the transfer order.

### C.    *Previous Delinquent History*

Appellant had no previous delinquent history, and the court properly found this criterion weighed against transfer, though the court noted appellant's negative behavior in school and juvenile hall.  While appellant cites his near-perfect school attendance and improved GPA while in juvenile hall as a counter to his negative behavior, neither party contests the court's finding on this criterion.

### D.    *Previous Attempts at Rehabilitation*

Because appellant had not previously come within the juvenile court's jurisdiction, the court found there were no previous attempts to rehabilitate appellant and this criterion weighed against transfer.  This finding is also uncontested.

### E.    *Circumstances and Gravity of Alleged Offenses*

In evaluating this criterion, the court may rely on evidence that "while not justifying or excusing the crime, tends to lessen its magnitude" (*Jones, supra*, 18 Cal.4th at p. 685), and must consider "the actual behavior of the person, the mental state of the person, the person's degree of involvement in the crime, the level of harm actually caused by the person, and the person's mental and emotional development" (§ 707, subd. (a)(3)(E)(ii)).

The court incorporated by reference its ruling and analysis on the degree of criminal sophistication because the analysis is similar in addressing the circumstances and gravity of the offenses.  The court added:  "[Appellant] shot the victim in the chest, despite [appellant] not being threatened by the victim.  The victim required treatment at the hospital for his gunshot wound.  The victim can have lasting physical and emotional effects from being struck by a bullet.  The victim indicated to the Probation Officer that he is still suffering mentally and has emotional flashbacks.  Additionally, [appellant]'s actions can cause an escalating response as indicated when [appellant] decided to arm himself against retaliation with another handgun."

Appellant argues the facts and circumstances leading to the "attempted robbery and shooting are no more remarkable than the routine drug deal/robbery gone bad." Appellant primarily focuses on the victim to argue the alleged offenses were not particularly grave. Specifically, appellant contends the victim was "an adult drug dealer selling his poison to children" and further alleges many dealers themselves carry weapons. Appellant contends Noah "understood his chosen profession" and "may be the victim" of his "child victims" one day.

We decline to engage in this type of victim blaming to absolve appellant of the gravity of his offenses. Appellant also misdescribes material facts and glosses over the seriousness of his role. Notwithstanding his profession, Noah was unarmed and ambushed by appellant who conspired with Stockdale to steal Noah's marijuana. While appellant acted with a coconspirator, appellant was the one who shot Noah. There is no evidence Noah was selling drugs to children as the arranged sale was with Stockdale, an adult at the time, not with appellant. We, like the court, find troubling that appellant shot Noah as he was driving away and posed no threat to appellant. Noah's injuries were fortunately not considered life-threatening despite the bullet's trajectory, but he unsurprisingly suffers from mental aftereffects.

Appellant argues the court "absolutely failed" to give any credence to appellant's mental state, mental development, or substance abuse at the time of the offenses. Appellant faults the court for failing to consider or appreciate Dr. Murphy's observations regarding these factors. But the court considered these factors in the first criterion's analysis, which the court incorporated by reference into its analysis of the gravity of the offenses. As previously discussed, the court considered Dr. Murphy's opinions, but found deficiencies in her approach and was not obligated to adopt her conclusions on contested facts. The "*fact finder* determines the facts, not the experts." (*In re Scott* (2003) 29 Cal.4th 783, 823.)

We conclude substantial evidence supports the court's findings on each of the five

criteria and its "ultimate" finding appellant was not amenable to rehabilitation while within the court's jurisdiction.  (*In re E.P., supra*, 89 Cal.App.5th at p. 416.)  The court did not abuse its discretion by transferring appellant to criminal court.

## **<u>DISPOSITION</u>**

The juvenile court's order transferring appellant to criminal court is affirmed.


                                                                        HILL, P. J.

WE CONCUR:


LEVY, J.


POOCHIGIAN, J.